IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:17-CV-306-RJ

| | |
|---|---|
| CAROLYN ARMA NOBREGA, ) | |
| ) | |
| Plaintiff/Claimant, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-17, -19] pursuant to Fed. R. Civ. P. 12(c). Claimant Carolyn Arma Nobrega ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the denial of her application for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is ordered that Claimant's Motion for Judgment on the Pleadings be denied, Defendant's Motion for Judgment on the Pleadings be allowed, and the final decision of the Commissioner be affirmed.

## I. STATEMENT OF THE CASE

Claimant protectively filed applications for a period of disability, DIB, and SSI on January 25, 2013, alleging disability beginning October 20, 2012. (R. 257–59, 262–67). The claim was denied initially and upon reconsideration. (R. 106–67). A hearing before an

Administrative Law Judge ("ALJ") was held on March 29, 2016, at which Claimant, represented by counsel, and a vocational expert ("VE") appeared and testified. (R. 46–90). On April 28, 2016, the ALJ issued a decision denying Claimant's request for benefits. (R. 13–43). On April 19, 2017, the Appeals Council denied Claimant's request for review. (R. 1–5). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her

findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

### III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520 and 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)–(c) and 416.920a(b)–(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3), 416.920a(e)(3).

In this case, Claimant alleges the following errors by the ALJ: (1) the RFC determination is not supported by substantial evidence; and (2) the credibility determination is not supported by substantial evidence. Pl.'s Mem. [DE-18] at 9–17.

## IV. ALJ'S FINDINGS

At step one, the ALJ found Claimant had not engaged in substantial gainful activity since her alleged onset date. (R. 18). Next, the ALJ determined Claimant had the severe impairments of systemic lupus erythematosus, obesity, depression, and borderline intellectual functioning, and the non-severe impairments of costochondritis, low back strain, fibromyalgia, peripheral neuropathy, migraine headaches, and chondromalacia patella. (R. 19). At step three, the ALJ concluded Claimant's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 19–21). Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments had resulted in no restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulties with regard to concentration, persistence, or pace, with no episodes of decompensation of an extended duration. (R. 20). Prior to proceeding to step four, the ALJ assessed Claimant's residual functional capacity ("RFC") finding that Claimant had the ability to perform a limited range of sedentary work[1] as follows:

She can lift, carry, push, and pull 10 pounds occasionally; stand and/or walk two

---

[1] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a); S.S.R. 96-9p, 1996 WL 374185, at *3 (July 2, 1996). "Occasionally" generally totals no more than about 2 hours of an 8-hour workday. "Sitting" generally totals about 6 hours of an 8-hour workday. S.S.R. 96-9p, 1996 WL 374185, at *3. A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed in 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 1. *Id.*

4

hours in an eight-hour workday; sit six hours in an eight-hour workday; frequently handle and finger with the bilateral upper extremities; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. She can never be exposed to unprotected heights, moving mechanical parts, weather, or extreme cold. She can perform simple, routine, and repetitive tasks. She can make simple work-related decisions.

(R. 21–37). In making this assessment, the ALJ found Claimant's statements about her limitations were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 23). At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work. (R. 37–38). At step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that Claimant can perform. (R. 38–39).

## V. DISCUSSION

### A. The ALJ's RFC Determination

An individual's RFC is the capacity an individual possesses despite the limitations caused by physical or mental impairments. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "[T]he residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting S.S.R. 96-8p). The RFC is based on all relevant medical and other evidence in the record and may include a claimant's own description of limitations arising from alleged symptoms. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *see also* S.S.R. 96-8p, 1996 WL 374184, at *5. Where a claimant has numerous impairments, including non-severe impairments, the ALJ must consider their

5

cumulative effect in making a disability determination. 42 U.S.C. § 423(d)(2)(B); *see Hines v. Brown*, 872 F.2d 56, 59 (4th Cir. 1989) ("[I]n determining whether an individual's impairments are of sufficient severity to prohibit basic work related activities, an ALJ must consider the combined effect of a claimant's impairments.") (citations omitted). The ALJ has sufficiently considered the combined effects of a claimant's impairments when each is separately discussed by the ALJ and the ALJ also discusses a claimant's complaints and activities. *Baldwin v. Barnhart*, 444 F. Supp. 2d 457, 465 (E.D.N.C. 2005) (citations omitted). The RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence," as well as a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*; *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

### 1. Opinion Evidence

When assessing a claimant's RFC, the ALJ must consider the opinion evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Regardless of the source, the ALJ must evaluate every medical opinion received. *Id.* §§ 404.1527(c), 416.927(c).[2] In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Additionally, more weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed,

---

[2] The rules for evaluating opinion evidence for claims filed after March 27, 2017, are found in 20 C.F.R. §§ 404.1520c and 416.920c, but 20 C.F.R. §§ 404.1527 and 416.927 still apply in this case.

6

longitudinal picture" of a claimant's alleged disability, than non-treating sources such as consultative examiners. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). When the opinion of a treating source regarding the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" it is given controlling weight. *Id.* However, "[i]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). The weight afforded such opinions must be explained. S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R. 96-6p, 1996 WL 374180, at *1 (July 2, 1996).[3] An ALJ may not reject medical evidence for the wrong reason or no reason. *See Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006). "In most cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (citations omitted).

### i. Dr. Shanahan's Opinion

---

[3] Rulings 96-2p and 96-6p were rescinded, effective March 27, 2017, and therefore still apply to this claim. 82 Fed. Reg. 15263-01 & 15263-02 (Mar. 27, 2017).

7

Claimant first contends the ALJ improperly weighed the opinion of Dr. Shanahan, Claimant's treating rheumatologist. Pl.'s Mem. [DE-18] at 10–13. Dr. Shanahan completed an RFC questionnaire on April 3, 2013, on which he indicated the following relevant information: he provided ongoing lupus management to Claimant, and her prognosis was guarded; her symptoms were pain, fatigue, depression, and pleurisy, and these symptoms constantly interfered with her ability to maintain the attention and concentration necessary to perform simple work-related tasks; her medications caused drowsiness and fatigue, and she would require more than the typical morning, lunch, and afternoon breaks; she could walk less than one block without significant pain or resting, could sit for 20 minutes or stand/walk for 5 minutes at one time, and sit for two hours and stand/walk none in an 8-hour workday, required an at-will sit/stand option and the ability to take unscheduled breaks of 5–10 minutes every 15–30 minutes during the workday; she could never lift even weight of less than 10 pounds, and her ability to perform gross and fine manipulation and reaching were limited to less than 1% of the workday; she was likely to be absent from work more than four times a month, and was not capable of working an 8-hour, 5 day a week job on a sustained basis; and she was not a malingerer. (R. 359–60). The ALJ gave Dr. Shanahan's opinion "little weight," explaining as follows:

> While mindful of the treating relationship, this check-box analysis has no explanation of analysis. Also, the degree of limitations posed here are not consistent with the treatment history as demonstrated in Exhibit 2F. For example, on January 9, 2013, Dr. Shanahan said the claimant appeared improved on most fronts (Ex. 2F/20). On January 30, 2013, the claimant reported she was doing "pretty good" and the treatment course was conservative in nature (Ex. 2F/13). On February 27, 2013, the claimant said she was "doing OK" (Ex. 2F/8). On April 3, 2013, the claimant reported overall improvement in pain issues and energy levels (Ex. B2F/4). On March 20, 2014, the claimant noted improvement and said her energy levels were starting to pick up (Ex. 8F/3). On March 25, 2015, the claimant said she was overall doing well (Ex. B10F/21). On September 9, 2015, Dr. Shanahan said the claimant's lupus had been quiet (Ex. 10F/8). On

8

> December 2, 2015, the claimant said her peripheral neuropathic pain was improved over the last three months (Ex. 10F/3).

(R. 36). The ALJ considered the appropriate factors, including treatment relationship, supportability, and consistency, 20 C.F.R. §§ 404.1527(c), 416.927(c), and explained his reasons for discounting Dr. Shanahan's opinion, citing substantial evidence in the record. *See Dunn v. Colvin*, 607 F. App' x 264, 267 (4th Cir. 2015) ("An ALJ' s determination as to the weight assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up ' specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(d) (1998)."). The ALJ was also justified in considering the form of Dr. Shanahan's opinion, because "the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is given." *Id.* at 268; *see also McGlothlen v. Astrue*, No. 7:11-CV-148-RJ, 2012 WL 3647411, at *6 (E.D.N.C. Aug. 23, 2012) (finding no error in ALJ's assignment of little weight to a form opinion lacking explanation and where accompanying treatment notes did not support the functional limitations stated in the form opinion); *Schaller v. Colvin*, No. 5:13-CV-334-D, 2014 WL 4537184, at *16 (E.D.N.C. Sept. 11, 2014) ("[S]ince the opinion is in the form of a questionnaire, the ALJ was entitled to assign it less weight than a fully explanatory and narrative opinion because such form opinions do not offer adequate explanation of their findings."); *Whitehead v. Astrue*, No. 2:10-CV-35-BO, 2011 WL 2036694, at *9-10 (E.D.N.C. May 24, 2011) (determining that a check-box form completed by a treating physician was not entitled to controlling weight where it was inconsistent with the physician's own treatment notes and gave no explanation or reasons for the findings).

In addition to the specific examples provided by the ALJ in assessing Dr. Shanahan's opinion, the ALJ also recounted in detail Dr. Shanahan's treatment notes spanning from November 2012 through February 2016. (R. 23–30). The ALJ concluded that Claimant's lupus improved after she began receiving a clinical study drug in December 2013, which was after Dr. Shanahan issued his opinion, and her improvement continued over time. (R. 33). The majority of the treatment notes Claimant cites in support of her position that the ALJ failed to consider her flare-ups, symptoms and limitations, and that she had good days and bad days, predate her treatment in the clinical trial. (R. 389, 395, 397, 400, 402, 416, 420, 427, 438, 440, 445, 455, 466, 471, 533, 670). More recent treatment notes cited by Claimant indicate her lupus was significantly improved since Dr. Shanahan issued his opinion in April 2013. *See, e.g.*, (R. 659–62) (Jan. 2014 treatment note indicating Claimant experienced more good days than bad days over the prior month with respect to her arthropathy, no obvious joint swelling, persistent discomfort in PIP and MCP joints but decreased degree of pain, and joint disease does not impact day-to-day activities). While Claimant continued to experience symptoms of neuropathy in her lower extremities, Dr. Shanahan assisted her with obtaining treatment medications, and by March 2015, Claimant "felt great" with no significant joint pain or swelling. (R. 704–54). Accordingly, the ALJ did not err in evaluating Dr. Shanahan's opinion where the ALJ correctly applied the law and his decision to afford little weight to Dr. Shanahan's opinion was supported by substantial evidence.

### ii. Other Opinion Evidence

Claimant next asserts that the ALJ erred in affording no more than little weight to any examining physical opinion, effectively relying on the non-examining state agency medical

10

consultant's opinion, or alternatively the ALJ's own lay opinion, in formulating the RFC. Pl.'s Mem. [DE-18] at 13–14. The regulations provide that medical opinions must be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), but ultimately the ALJ bears responsibility for determining a claimant's RFC, *id.* §§ 404.1527(d)(2), 416.927(d)(2). *See King v. Colvin*, No. 5:14-CV-401-RJ, 2015 WL 5655807, at *6 (E.D.N.C. Sept. 24, 2015) (rejecting argument that the ALJ was required to have a medical opinion as to a claimant's functional abilities because the ALJ cannot make his own specific medical findings) (citing 20 C.F.R. § 416.927(d)(2)). The ALJ weighed and considered the opinion evidence, along with Claimant's testimony and the medical treatment records, in formulating the RFC in accordance with the law. Accordingly, the ALJ did not commit error in evaluating the opinion evidence, where it was the role of the ALJ to determine Claimant's RFC after considering all the medical opinions and other relevant evidence, and he was not required to rely on any one opinion in doing so.

Claimant also asserts that the ALJ erred in evaluating the opinion of Dr. Downing, a consultative psychologist, who performed a clinical psychological evaluation of Claimant on July 9, 2014. Specifically, Claimant argues that the ALJ failed to reconcile Dr. Downing's opinion with the RFC, where the ALJ afforded great weight to Dr. Downing's opinion as a whole, but failed to incorporate a restriction into the RFC based on Dr. Downing's opinion that Claimant had a decreased ability to tolerate stress and would function best in a low stress setting. Pl.'s Mem. [DE-18] at 14–15. Dr. Downing provided the following summary and opinion regarding Claimant's intellectual abilities:

> As a result of the interview, it has been determined that the claimant is able to understand, retain and follow instructions though will have difficulty with more complex and difficult tasks. Moreover, she is able to sustain the attention needed to perform simple and repetitive tasks though again might have difficulty with

11

more complex tasks. The claimant has the ability to relate to others, including peers and customers, in an effective and appropriate manner. She is also able to relate effectively to supervisors. Finally, the claimant has a decreased ability to tolerate stress and pressure and therefore would function best within a low stress environment.

(R. 644). The ALJ gave great weight to Dr. Downing's opinion, explaining as follows:

> Consultative examiner Dr. Downing rated the claimant's GAF at 49. She said the claimant was able to understand, retain, and follow instructions, though she would have difficulty with more complex and difficult tasks. She was able to sustain the attention needed to perform simple and repetitive tasks, though she might have difficulty with more complex tasks. She had the ability to relate to others, including peers and customers, in an effective and appropriate manner. She was also able to relate effectively to supervisors. The claimant had a decreased ability to tolerate stress and pressure and would function best in a low stress environment. The claimant would be able to manage her own benefits (Ex. B6F). The undersigned gives great weight to Dr. Downing's opinion. Her diagnosis of borderline intellectual functioning is consistent with prior testing by Dr. Ziff (Ex. B3E/13-15). The claimant was able to work in a semi-skilled job for 10 years, though she reported her coworkers helped her. She stated she was efficient in tasks that required repetition and that was what the data entry job involved (Ex. B6F/3). The claimant testified she is able to care for her children and provide afterschool care for three children in elementary and middle school (Hearing testimony). The claimant reported she was able to manage her own money and write checks (Ex. B6F/3).

(R. 35). The ALJ determined Claimant could perform simple, routine, and repetitive tasks and could make simple work-related decisions, but did not limit Claimant to a low-stress environment. (R. 21). The ALJ did not specifically address Dr. Downing's opinion that Claimant would function better in a low-stress environment. (R. 35). However, in summarizing Claimant's testimony, the ALJ noted that at the March 2016 hearing, Claimant "testified she handles stress well." (R. 23, 83). Therefore, based on Claimant's own testimony, the ALJ did not err in failing to limit Claimant to working in a low-stress environment. Further, the ALJ's decision not to impose a limitation on social interaction is supported by Dr. Downing's opinion that Claimant could adequately relate to peers, customers, and supervisors. (R. 35, 644). The

12

ALJ's RFC is otherwise consistent with Dr. Downing's opinion where they both limit Claimant to simple tasks and simple work-related decisions. *Id.* Accordingly, there is no unsupported inconsistency between the ALJ's evaluation of Dr. Downing's opinion and the RFC.

### 2. Evaluation of Claimant's Subjective Symptoms

When assessing the RFC, an ALJ must consider a claimant's subjective symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a); S.S.R. 16-3p, 2016 WL 1119029 (Mar. 16, 2016) (effective Mar. 28, 2016). Federal regulations 20 C.F.R. §§ 404.1529 and 416.929 provide the "authoritative standard" for the evaluation of subjective complaints of pain and symptomology, whereby "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 593–94. First, the ALJ must objectively determine whether the claimant has medically documented impairments that could cause his or her alleged symptoms. *Id.* at 594 (citing 20 C.F.R. §§ 404.1529(b), 416.929(b)). If the ALJ makes an affirmative finding at the first step, at the second step the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." *Id.* at 595 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). The ALJ must consider "not only the claimant's statements about her pain, but also 'all the available evidence,' including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Id.* (internal citations omitted) (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)). While objective medical evidence must be considered in evaluating pain and other

subjective symptoms, "because pain is subjective and cannot always be confirmed by objective indicia, claims of disabling pain may not be rejected 'solely because the available objective evidence does not substantiate [the claimant's] statements' as to the severity and persistence of her pain." *Craig*, 76 F.3d at 595 (quoting 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2)).

The ALJ summarized Claimant's hearing testimony as follows:

> [C]laimant testified she lives with her boyfriend and two children, ages 12 and 5. She stated both children were in school. She said she is five feet, seven inches tall and weighs 261 pounds. The claimant testified she is right-handed. She stated she has a driver's license and drives. She said she went to a specialized high school for children with a learning disability in New York and went to the tenth grade. The claimant testified she is working now, doing afterschool care for three children, grades three, four, and six. She stated she watches them two to three hours every day in her home. She said she works on the weekend if needed. The claimant testified she lets them play or finish their homework. She stated she has done this since 2010. She said she is paid weekly in cash 150 to 160 dollars. The claimant testified she tried to deliver newspapers in 2014 and worked for two to three months. She stated she earned 200 dollars every two weeks. She said she could not finish and had to break the contract. She also did data entry work sitting at a computer, and there was no lifting (Hearing Testimony).
>
> The claimant testified her hands hurt most of the time. She stated she has pain in all of her joints, including her elbows, shoulders, and back. She said there was tingling on the bottom of her foot, all due to lupus. The claimant testified Dr. Shanahan has her in a clinical trial for an infusion once a month. She stated it is helping significantly, and she has not noticed side effects. She said before the infusions, she could barely get out of bed and could not help with the children. The claimant testified she still struggles, but it is not severe. She stated she can fix breakfast. She said before the infusions, she was in a clinical trial with injections in her stomach every two weeks, and she had more flares ups. The claimant testified she now has less flare-ups. She stated she has headaches, for which she takes Topamax daily, steroids, and ibuprofen. She said she gets headaches six times a week, and three times are migraines (Hearing Testimony).
>
> The claimant testified she had sharp pain like needles on the bottom of her foot. She stated it has been an issue for a year and a half. She said she had achy joint pain daily. The claimant testified she has cold sores in her mouth from flare-ups. She stated she has a flare up one or two times a month for three or four days. She said during a flare up, she does less and lies down more. The claimant testified during a flare up, she is exhausted and more snappy and agitated. She stated oral

14

steroids help. She said she can lift five pounds and cannot walk far. The claimant testified she climbs her stairs once a day. She stated it is difficult to bend or stoop, and her son helps her. She said she has depression when she is not able to help her children. The claimant testified she was taking medication, but it made her nauseous. She stated she is not taking medication for depression now. She said she prays and takes deep breaths (Hearing Testimony).

The claimant testified she wakes up early to get the children out. She stated she takes a nap and does a little housework. She said she tries to wash a load of clothes, and the children help her. The claimant testified she watches television and bakes. She stated she tries to grocery shop but pushes the cart slowly and takes breaks. She said someone is with her when grocery shopping. The claimant testified when she has a flare up, she has problems with her personal care in the bathroom. She stated if her hands are cold, they turn purple, and she cannot do anything. She said her hands would be numb. The claimant testified she has a burning sensation in her back three to four times a week. She stated standing and sitting is difficult, and she is most comfortable lying down. She said she tries to lie down when her back is inflamed. The claimant testified she handles stress well. She stated she has rashes but it has been a while. She said she never has a day without pain (Hearing Testimony).

(R. 22–23). The ALJ determined that Claimant's statements regarding her symptoms were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. 23). Claimant contends the ALJ's credibility determination[4] is not supported by substantial evidence because the ALJ mischaracterized the nature of lupus and the medical evidence, and Claimant showed noticeable increases in lupus symptoms prior to joining the clinical trial and when missing doses of her clinical trial treatment, which may or may not continue. Pl.'s Mem. [DE-18] at 16–17.

The ALJ exhaustively chronicled Claimant's medical history surrounding her lupus, evaluated the relevant medical opinion evidence, and considered both Claimant's hearing

---

[4] Social Security Ruling 16-3p, effective March 28, 2016, eliminated the use of the term "credibility" for the purpose of clarifying that "subjective symptom evaluation is not an examination of an individual's character." 2016 WL 1119029, at *1 (Mar. 16, 2016). In this case, the ALJ did not find Claimant to be "not credible," but rather determined that Claimant's statements regarding her symptoms were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. 23). Thus, the court considers, consistent with S.S.R. 16-3p and the relevant regulations, whether the ALJ evaluated Claimant's subjective symptoms in accordance with the law and whether his determination in this regard is supported by substantial evidence.

testimony as well as her complaints and objective symptoms found in the medical records. (R. 22–33, 35–37). As explained above with respect to the ALJ's evaluation of Dr. Shanahan's opinion, the ALJ's determination that Claimant's symptoms from lupus substantially improved after she began receiving the clinical trial drug is supported by substantial evidence. The ALJ explained,

> The undersigned finds the claimant has systemic lupus erythematosus but has improved while on a clinical study drug. After her first infusion, the claimant reported in December 2013 that her arthralgia was a little better, most notably in the finger joints. She still had some swelling and soreness but less intense. Morning gel persisted for about 10 minutes, with mild gel during the day. She had no new skin rash or mucosal ulcerations. Her pleurisy had resolved. Dr. Shanahan said she was much better. In January 2014, Dr. Shanahan said the claimant's lupus appeared to be under better control over the past couple of months. In March 2014, the claimant said she felt there had been some improvement in her lupus. She felt her energy levels were better, and she had some improvement in joint pain. Dr. Shanahan said the claimant continued to improve slowly but steadily. There were no tender or swollen joints on examination (Ex. B8F).
>
> In July 2014, the claimant had a normal physical consultative examination. She was able to walk on her heels and toes, and she was able to squat and rise. Her grip strength, ability to grasp, and ability to raise her arm overhead were normal. She had no swelling or deformity in her joints and had full range of motion (Ex. B4F). In August 2014, Dr. Shanahan said the lupus seemed relatively quiet. She had waxing and waning disease activity over the past couple of months. In September 2014, she had no significant disease activity. In October 2014, the claimant missed her last infusion and noticed an increase in lupus symptoms, primarily worsening peripheral joint pain and worsening neuropathic pain in both lower extremities. She resumed the infusions and in December 2014, she said she felt improvement since she started the study drug infusions (Ex. B10F).
>
> In March 2015, Dr. Shanahan said the claimant was doing well overall. The claimant said she had felt great for the past month. She had no significant joint pain or joint swelling. She denied skin rashes, alopecia, mucosal ulcerations, pleurisy, fevers, or weight loss. Dr. Shanahan said the lupus was quiescent. The labs showed no evidence of disease activity. In June 2015, the claimant did not report any joint pain or stiffness. Dr. Shanahan said overall she was doing quite well. In August 2015, Dr. Shanahan said the claimant's lupus had been relatively quiet, without any significant peripheral joint pain or swelling. He said there was

16

> no active disease at that point. In December 2015, the claimant's peripheral neuropathic pain had improved over the past three months. She had decreased dependency on gabapentin (Ex. B10F). In February 2016, Dr. Shanahan said the lupus appeared well-controlled (Ex. B11F). The undersigned finds the claimant has improved since the infusions started, and she noticed an increase in symptoms when she missed an infusion. After resuming the infusions, she improved. The claimant's reports to her treating physician show she felt well overall. The claimant's peripheral neuropathy decreased as well. The undersigned has limited the claimant to sedentary work activity with additional postural, manipulative, and environmental limitations as a result of her lupus.

(R. 33). The ALJ acknowledged that at times Claimant experienced "waxing and waning disease activity" related to her lupus and expressly discussed her increased symptoms when she missed an infusion treatment. *Id.* The ALJ appropriately considered all the evidence, including Claimant's testimony regarding her symptoms, and imposed a highly restrictive RFC despite the improvement in Claimant's lupus. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). The ALJ's opinion reflects a complete understanding of Claimant's lupus and her reliance on the clinical trial drug, and the fact that Claimant may at some point be removed from the clinical trial is not relevant to her condition during the relevant period. "Subject only to the substantial evidence requirement, it is the province of the [ALJ], and not the courts, to make credibility determinations and to resolve ambiguities in the evidence." *Mickles v. Shalala*, 29 F.3d 918, 929 (4th Cir. 1994). The ALJ correctly applied the law and did not err in evaluating Claimant's subjective symptoms.

## VI. CONCLUSION

For the reasons stated above, it is ORDERED that Claimant's Motion for Judgment on the Pleadings [DE-17] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE-19] be ALLOWED, and the final decision of the Commissioner be affirmed.

SO ORDERED, the 3rd day of May 2018.

Robert B. Jones, Jr.
United States Magistrate Judge